

### POLICE CRIMINAL COMPLAINT

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| | 06/11/2019 | | 00683465/190008846 |

| Defendant Name | First | Middle | Last |
|---|---|---|---|
| | KARIMU | | HAMILTON |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of section 4904 of the Crimes Code (18 PA C.C. 4904) relating to unsworn falsification to authorities.

4. This complaint is comprised of the preceding page(s) numbered __1__ through __2__.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of Assembly, or in violation of the statutes cited. **(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

June 11 , 2019                   #95
(Date)                                            (Signature of Affiant)

AND NOW, on this date _____ I certify that the complaint has been properly completed and verified. An affidavit of probable cause must be completed before a warrant can be issued.

32-1-27
(Magisterial District Court Number)                           (Issuing Authority)



**POLICE CRIMINAL COMPLAINT**

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| | 06/11/2019 | | 00683465/190008846 |

| Defendant Name | First | Middle | Last |
|---|---|---|---|
| | KARIMU | | HAMILTON |

### AFFIDAVIT of PROBABLE CAUSE

On June 10, 2019 around 1200 hours I, Detective Jonathan Jagodinski of the Radnor Township Police Department, was on duty and assigned to the Investigations Division. At that time Rachel Ridgeway came to the Radnor Township Police Department Headquarters regarding an incident which occurred on June 8, 2019 between 1700 hours and 2130 hours. Ridgeway stated during that time period Hamilton, while standing on Hamilton's portion of their shared front porch, yelled obscenities and threats at her. Ridgeway stated during that time Hamilton called her a "dumb ass white cracker bitch." Ridgeway stated Hamilton also stated "watch what I do to you bitch", "you better stay behind those fucking doors bitch" and "fucked up cunt cracker bitch, keep fucking with me bitch." Further, Ridgeway stated Hamilton expressed to her that she should "get the fuck out of here" and that she "need to move bitch." Ridgeway stated Hamilton stopped the above activity around 2130 hours on June 8, 2019 and resumed yelling at 0600 hours on June 9, 2019. Ridgeway stated Hamilton continued yelling, which included similar content as the above, until Ridgeway left for church at 0940 hours. Ridgeway completed a written statement regarding the above.

Due to the above information I, Detective Jonathan Jagodinski of the Radnor Township Police Department, respectfully request that Karimu Hamilton be called to answer to the listed charges.

I, **OFFICER JONATHAN JAGODINSKI (95)** _____, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA* THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, 2019

_____ Date _____, Magisterial District Judge

My commission expires first Monday of January, _____

**Delaware County Court of Common Pleas**
**Criminal Program**
**Subpoena for Arraignment**

TO: Karima Hamilton
_Defendant's Name_

Docket No. CR-112-19   0722537-4

Magisterial District Number: 32-1-27

    You are hereby subpoenaed and are required to appear in person in the Arraignment Room, Second Floor, Court House, Media, Pa. on _____ at 9:00 A.M. to be formally arraigned on charges resulting from the above referenced case. You are further required to appear with your attorney at this time. If you cannot afford a lawyer one can be provided by the County free of cost.

_____   5/28/19
         Issuing Authority                     Date

    I acknowledge receipt of a copy of the above subpoena and I understand that it requires me to appear with my attorney in the Arraignment Room at the time and place so designated. I also understand that if I fail to appear, I will be declared a fugitive from justice and that I can be charged with a separate offense which is "default of appearance" which may result in a jail sentence.

_____   5/29/19
     Defendant's Signature                   Date

30 Garrett Avenue, Rosemont PA  19010

| Number | Street | City | State | ZIP |
|--------|--------|------|-------|-----|

**DEFENDANT**

OTN: _____

## WAIVER OF RULE 600 AND SPEEDY TRIAL RIGHTS

**NOTICE TO DEFENDANT:**    Read everything on this paper and <u>Understand</u> it before you sign.
You are <u>Giving Up</u> important rights by signing this paper.

I, ___Karimu Hamilton_____, have read this paper and discussed its meaning with my attorney. I understand this document and I freely agree to waive (give up) my Rule 600 and Speed Trial Rights by signing this document.  I understand that under Rule 600 the charges against me must be brought to trial within 365 days from the date on which the criminal complaint was filed (or 120 days from the granting of a new trial or the withdrawal of a guilty plea), except that any of the following periods of time are added to the 365 day period.

1) any time period between the filing of the criminal complaint and my arrest during which my whereabouts were unknown to authorities and could not be determined by their due diligence; or
2) any time period for which I expressly waive (give up) my rights under Rule 600, (such as my signing of this paper today); or
3) any delay caused by the unavailability or me or my attorney, or by any continuance granted at my request or the request of my attorney.

I further understand that if I am in prison on this offense for 180 days prior to trial, plus any of the three time periods above, I am entitled to release on nominal bail pending my trial.  I understand that if I am not brought to trial within the 365 day time period required by Rule 600, the charges against me in this case will be dismissed, and I will never be tried on these offenses, unless the Court finds that the Commonwealth has exercised due diligence in attempting to be prepared to proceed to trial.

I also understand that I have a right to a speed trial under the United States and Pennsylvania Constitutions.  I understand that under these Constitutions a judge can dismiss the charges against me if it is determined that the length of delay between the crime and my trial, the reasons for the delay, my requests (if any) to be tried, and prejudice to me requires such a dismissal.

I am not under the influence of alcohol, or drugs or any other substance.  I do not suffer from mental illness or anything else, which would prevent me from understanding this document and what I am doing.  I am signing this paper voluntarily and of my own free will.  I have not been threatened or pressured or promised anything by anyone to make me sign this paper.

I agree to waive (give up) all of my speed trial rights under Rule 600 and the United States and Pennsylvania Constitutions from ____8-1-19_____, 20_____, to ___8-15-19_____, 20_____.

8-15-19

I understand that my Preliminary Hearing date is _____.

X _Refused to sign_
(Defendant)

As attorney for the defendant in this matter, I have discussed this document and its legal meaning with my client.  I believe that this waiver is being made knowingly, intelligently and voluntarily.

_____
(Counsel for Defendant)

1               IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY

2                           PENNSYLVANIA

3

4                      CRIMINAL DIVISION

5

6    * * * * * * * * * * * * * * *    **No. CR-112-19**

7                               *

8    **COMMONWEALTH OF PENNSYLVANIA**  *

9                               *

10           **VS.**              *

11                               *

12    **KARIMU HAMILTON**          *

13                               *

14    * * * * * * * * * * * * * * *

15

16

17               Newtown Square, PA, August 29, 2019

18

19                    ***

20

21               Regional Court Number 32-1-27

22

23                    ***

24              TRANSCRIPT OF PROCEEDINGS

25

26    BEFORE:  THE HONORABLE DAVID R. LANG

27

28           BRITTANY GREEN, ESQUIRE

29           For the Commonwealth

30

31           THOMAS MARTINICCHIO, ESQUIRE

32           For the Defendant

33

1                                    <u>INDEX</u>

2

3                          DIRECT  CROSS  REDIRECT  RECROSS
4      <u>ON BEHALF OF THE COMMONWEALTH:</u>
5      Rachel Ridgeway              8        13        18
6
7      <u>ON BEHALF OF THE DEFENDANT:</u>
8      [None]
9
10                               <u>EXHIBITS</u>
11
12                                  MARKED    ADMITTED
13     <u>ON BEHALF OF THE COMMONWEALTH:</u>
14     [None]
15
16     <u>ON BEHALF OF THE DEFENDANT:</u>
17     [None]

18

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

<pre>
 1                  P R O C E E D I N G S
 2                     August 29, 2019
 3     THE COURT:
 4              Okay.  This is the matter of the Commonwealth
 5              of Pennsylvania versus -- is it Karamoo [ph]?
 6     MS. HAMILTON:
 7              Karimu.
 8     THE COURT:
 9              Karimu?  Karimu Hamilton.  This is CR-112-19.
10              The Defendant is present in court.  Would
11              counsel -- Counsel, if you would tell me what
12              your -- your appearance, please.
13     MR. MARTINICCHIO:
14              Thomas Martinicchio, Attorney ID 321694, on
15              behalf of the Defendant, Karimu Hamilton,
16              present seated to my right of the defense
17              table.  However, Judge, at this time I would
18              not waive the reading of the criminal
19              Complaint.  I would like that to be read on
20              the record, and I would make a motion before
21              we get started here today.
22     THE COURT:
23              Well, why don't you tell me what the motion is
24              going to be.
25     MR. MARTINICCHIO:
</pre>

1          Judge, the motion would be based on the

2          Affidavit of Probable Cause even if we were

3          taking everything in here to be true, there's

4          nothing here that indicates that any

5          terroristic threats were made.  There were

6          some things that were said that involved

7          obscenities or anything like that.  There is a

8          statement that says, you know, watch what I do

9          to you, bitch.  However, even in the light

10          most favorable to the Commonwealth, watch what

11          I do to you, that doesn't have -- doesn't

12          necessarily mean physical harm.  It could be

13          in eviction.  It could be, you know, filing

14          paperwork, you know, with the police

15          department.  I don't believe that any of these

16          quotes that are stated here you need to move,

17          get the F out of here, you know, dumb ass.

18     THE COURT:

19          It doesn't -- isn't that an issue that, you

20          know, the Commonwealth is going to put on the

21          testimony, and then I have to make a decision

22          whether or not there's a prima facie case.

23     MR. MARTINICCHIO:

24          Yes, Judge.  And my -- what I was just trying

25          to do is based on the report here, I would say

1                  that...

2        THE COURT:

3                  Yeah.

4        MR. MARTINICCIO:

5                  ...the Court doesn't have enough.

6        THE COURT:

7                  I understand, but you know...

8        MR. MARTINICCHIO:

9                  That would be my argument, Judge.

10       THE COURT:

11                 But I understand.  I'm not going to -- you

12                 know, but I'm not going to do that because,

13                 look, we all know that that sometimes what's

14                 in here isn't necessarily always everything.

15                 Okay.  So there may be other things that are

16                 going to be said today, so, you know, let's

17                 wait and see what the testimony is, and then

18                 I'll make a decision.  Because it may end up

19                 being more than what's just in the Affidavit

20                 of Probable Cause.

21       MR. MARTINICCHIO:

22                 Understood, Judge, and just for the record, I

23                 would just object that it's the Commonwealth

24                 and the officer's burden to include everything

25                 to -- in the Affidavit.

1    THE COURT:

2              Yeah.  I understand, but we know that doesn't

3              always happen.

4    MR. MARTINICCHIO:

5              I know, Judge.  Understood.

6    THE COURT:

7              Okay.  That's fine.  For the Commonwealth?

8    MS. GREEN:

9              Good afternoon, Your Honor.  Brittany Green on

10             behalf of the Commonwealth, Attorney ID

11             325781.

12   THE COURT:

13             Okay.  All right.  Anything that we're going

14             to be amending here before we proceed?

15   MS. GREEN:

16             No, Your Honor.

17   THE COURT:

18             Are you neighbors?

19   MS. RIDGEWAY:

20             Yes, Your Honor.

21   THE COURT:

22             Have there been any discussions about getting

23             this thing worked out, rather than having a

24             preliminary hearing on something like this?

25   MS. GREEN:

```
1                  Your Honor, I've spoken to the detective and
2                  I've spoken to the victim.
3    MR. MARTINICCHIO:
4                  Judge, our office didn't receive any offers.
5    THE COURT:
6                  So we want to -- okay.  That's fine.  All
7                  right.  Go ahead.
8    MS. GREEN:
9                  At this time, Your Honor, the Commonwealth
10                 calls Rachel Ridgeway to the stand.
11                              ***
12   [Witness Sworn]
13                              ***
14    THE COURT:
15                 Okay.  Have a seat, please.  Give us your full
16                 name, and spell your last name for the record,
17                 please.
18   MS. RIDGEWAY:
19                 Rachel Ridgeway, R-i-d-g-e-w-a-y.
20   THE COURT:
21                 Thank you.  You may proceed.
22   MS. GREEN:
23                 Thank you, Your Honor.
24                              ***
25                      RACHEL RIDGEWAY,
```

York Stenographic Services, Inc.

34 North George St., York, PA 17401 - (717) 854-0077

1    having been first duly sworn, was called as a witness

2    herein and was examined and testified as follows:

3                              ***

4                     DIRECT EXAMINATION

5    BY MS. GREEN:

6            Q.   Ms. Ridgeway, I'm going to direct your

7    attention back to June 8, 2019, around 5:00 p.m.   On

8    that date and at that time were you living at 30 Garrett

9    Avenue in Rosemont, Delaware County?

10           A.   32.

11           Q.   32?

12           A.   Yes.

13           Q.   Okay.  And was there something that

14   occurred that you reported to the police?

15           A.   So the police had just left the premises,

16   and yes, then afterwards the Defendant came outside.  We

17   have a shared porch, and started screaming threats and

18   profanity.

19           Q.   So you said the Defendant.  Is the person

20   who came out on the -- who shares the porch with you and

21   who was yelling, is she in the courtroom today?

22           A.   Yes.

23           Q.   Can you identify her by a piece of

24   clothing she's wearing today?

25           A.   She's wearing a polka dot dress.

1                              ***

2    MS. GREEN:

3            Your Honor, let the record reflect the

4            witness'...

5    THE COURT:

6            I'll note it.

7    MS. GREEN:

8            Thank you.

9                              ***

10   BY MS. GREEN:

11           Q.   Now, you said that you have a shared

12   porch, and that the Defendant came out onto the porch.

13   Where was she in conjunction to where you were?

14           A.   So I didn't look out my window, but our

15   porch is small.  So she would have been directly outside

16   of my front door.

17           Q.   And you said that you heard her making

18   threats and comments.  Do you recall what she was

19   saying?

20           A.   Yes.  She told me to wait and see what

21   she was going to do to me.  She told -- she said that I

22   should move.  She called me -- I don't remember exactly,

23   but it was along the lines of dumb cracker bitch, and...

24           Q.   Did you write a written statement...

25           A.   I did.

```
 1              Q.   ...in regards -- would looking at that
 2      refresh your recollection?
 3              A.   It would.  Yes.
 4                              ***
 5      MS. GREEN:
 6              Your Honor, I have what I'd like to mark as
 7              C-1 for identification purposes.  I can give
 8              you a copy after...
 9      MR. MARTINICCHIO:
10              Yes.
11      MS. GREEN:
12              May I approach?
13      THE COURT:
14              Yes.
15                              ***
16      BY MS. GREEN:
17              Q.   I'm handing you what's been marked as
18      C-1.  Do you recognize it?
19              A.   Yes.
20              Q.   And what is it?
21              A.   It's the statement I wrote on Monday with
22      the officers.
23              Q.   Okay.  And is it based off of the
24      incident that had occurred that we're talking about?
25              A.   Yes.
```

1          Q.   Okay.  And why don't you tell me what you

2     had written that the Defendant had said to you.

3          A.   So she called me a dumb ass white cracker

4     bitch, and said watch what I do to you, bitch.  She said

5     that I didn't know who I was fucking with, and that I

6     needed to move.  She called me a fucked-up cunt cracker

7     bitch, and said keep fucking with me.  And she

8     repeatedly accused my husband of adultery.  She said

9     several times that I needed to keep my stepdaughter's

10    car the fuck off her property, which I wasn't quite sure

11    what that meant.  And just continued on about it.

12         Q.   Now I just want to specify, did this

13    occur over a short period of time?

14         A.   No.  It started about five, and then it

15    didn't stop until after nine.

16         Q.   Nine o'clock?

17         A.   Yes.

18         Q.   So it's approximately four hours?

19         A.   Approximately four hours on and off.

20    Yes.

21         Q.   And were you alone in your home?

22         A.   I was home with my son -- my two-year-old

23    son, and my 18-year-old stepdaughter was there for a

24    brief period of time.

25         Q.   And when the Defendant was outside of

1     your home you said outside of the door, how did you feel

2     when these things were being said?

3                A.   I was scared.

4                Q.   And why were you scared?

5                A.   I have kids, and you know, we share a

6     wall.  We basically share a property.  So for me that

7     was scary.

8                           ***

9     MS. GREEN:

10               Okay.  Court's indulgence, Your Honor.

11                          ***

12    BY MS. GREEN:

13               Q.   Now did anything happen the next day?

14               A.   The next morning it started again at

15    about six in the morning.  She started yelling the same

16    things, telling us to move, and that I was the dumb

17    bitch.  By the time I left the house -- I think I left

18    around 9:30 to go to church, and it had stopped by then.

19                          ***

20    MS. GREEN:

21               Your Honor, I have nothing further at this

22               time.

23    THE COURT:

24               Go ahead, Counsel.

25                          ***

```
1                      CROSS EXAMINATION

2    BY MR. MARTINICCHIO:

3            Q.   Good afternoon, ma'am.  So you had

4    indicated -- you said that this happened right after

5    police just left the premises.  Police were at your

6    premises earlier that day?

7            A.   That's correct.

8            Q.   And is that because my client had called

9    police and made an incident report regarding you

10   harassing her, and reporting gas odors consistently to

11   PECO?

12                         * * *

13   MS. GREEN:

14           Objection, Your Honor, to the relevance.

15   MR. MARTINICCHIO:

16           Judge, I think this is retaliation is what our

17           argument would be.

18   THE COURT:

19           Well, no, but if -- I'm going to overrule the

20           objection, and I mean that's what's in the

21           Affidavit, and that's what you testified to.

22           It's cross examination.  Go ahead.

23   MS. RIDGEWAY:

24           Should I answer?

25   THE COURT:
```

1           You certainly can.

2   MS. RIDGEWAY:

3           Okay.  I had called the police due to an odor

4           smell in my house earlier that -- a sewage

5           smell earlier that was in my house.  It was

6           the second time that that had occurred.  And

7           previously, they had come in and done gas

8           readings.  So I had called 911 again, because

9           I was concerned.

10                              ***

11  BY MR. MARTINICCHIO:

12          Q.   Okay.  Now did PECO investigate your

13  house?

14          A.   Yes.

15          Q.   At that time?  And they investigated her

16  house, correct?

17          A.   Yes.

18          Q.   Okay.

19                              ***

20  MS. GREEN:

21          Your Honor, indicating her being the

22          Defendant.

23  THE COURT:

24          Yes.

25                              ***

1    BY MR. MARTINICCHIO:

2              Q.   And there was no leak reported, correct?

3              A.   That's correct.

4              Q.   And at that time my client -- is this the

5    first time that you had called about a gas leak?

6                      ***

7    MS. GREEN:

8              Objection, Your Honor, to the relevance.

9    THE COURT:

10           Yeah.  I mean...

11   MR. MARTINICCHIO:

12          Okay.

13   THE COURT:

14          ...I'm going to assume that there's an ongoing

15          male contention between these two individuals.

16          So let me just say I know that they don't get

17          along.  So let's -- with that assumption,

18          let's move on.

19                ***

20   BY MR. MARTINICCHIO:

21          Q.   Okay.  And so just to clarify, the police

22   that had left the premises was that due to your call, or

23   to my client's call?

24          A.   Can you read the question?

25          Q.   When you said police had just left the

1    premises wen my client had come out and started saying

2    these things to you...

3              A.   Yes.

4              Q.   Was that due to you calling the police,

5    or my client calling the police?

6              A.   The police had come to the property

7    because I had called them.

8              Q.   Okay.  And did you receive an incident

9    report for that?

10             A.   I did not.

11                           ***

12   MR. MARTINICCHIO:

13             Okay.  Court's indulgence.

14                           ***

15   BY MR. MARTINICCHIO:

16             Q.   So briefly, you said that she said this

17   to you while you were outside.  You share a common area?

18             A.   She was outside.

19             Q.   Of your home?

20             A.   Yes.

21             Q.   On your property?  Or, on her side of the

22   property?

23             A.   I couldn't tell you.  Our porch is --

24   there's no divider for our porch...

25             Q.   Okay.

1          A.    So she was close enough that I was able
2    to record it clearly.
3          Q.    Okay.  And you were outside at this time,
4    or inside?
5          A.    I was inside.
6          Q.    You were inside?  You were inside the
7    duration of this time?
8          A.    Yes.
9          Q.    You never came outside once?
10         A.    I was scared to come out.
11         Q.    And you didn't call police?  You weren't
12   scared enough to call police?
13         A.    The police had told me earlier that day,
14   because I had asked them before they left what I was
15   supposed to do, they had told me that there was nothing
16   that they could do at that time.  They strongly
17   suggested that I come down to the township building
18   Monday morning and file a report.
19         Q.    Okay.  But if you felt in fear of your
20   life, you didn't think it was necessary to call the
21   police at that time?
22         A.    I was -- when I was inside my house I was
23   not in fear of my life.  I was not about to go outside
24   of my house, and I had no reason to go outside of the
25   house.

1                              ***

2    MR. MARTINICCHIO:

3              Okay.  Nothing further.

4    MS. GREEN:

5              Just briefly.

6                              ***

7                   REDIRECT EXAMINATION

8    BY MS. GREEN:

9         Q.   Was there anything that came from the

10   PECO investigation when you called?

11        A.   Yes.

12        Q.   What happened?

13        A.   Ms. Hamilton has been condemned because

14   there was sewage being sub-pumped out of the basement

15   onto the side of her property.

16        Q.   And that what was discovered when the

17   police were there?

18        A.   And there was a large amount of...

19                              ***

20   MR. MARTINICCHIO:

21             Judge, objection.

22   MS. RIDGEWAY:

23             ...sewage in her basement.

24   MR. MARTINICCHIO:

25             Well, it's her testimony.

1      MS. GREEN:

2              Your Honor, he opened it up on cross.

3      MR. MARTINICCHIO:

4              Judge, that was her...

5      THE COURT:

6              Okay.  You opened the door on that.

7      MR. MARTINICCHIO:

8              No.  I understand.  That's why...

9      MS. GREEN:

10             You're revoking your objection?

11     MR. MARTINICCHIO:

12             Well, no.  She is.  Objection...

13     MS. GREEN:

14             Understood.

15     MR. MARTINICCHIO:

16             Yeah.

17     THE COURT:

18             Go ahead.

19                              ***

20     BY MS. GREEN:

21             Q.   You said that it was from the incident

22     what you had just described the results of that?  That

23     was from the incident when you called the police because

24     of the sewage odor?

25             A.   Yes.  PECO reported that there was sewage

1   leakage in the basement, even though it wasn't -- there

2   wasn't a gas reading.

3                             ***

4   MS. GREEN:

5           Understood.  Nothing further, Your Honor.

6   MR. MARTINICCHIO:

7           And how do you know what PECO said about her

8           home?

9   THE COURT:

10          You know what?  Okay.  I don't care.

11  MR. MARTINICCHIO:

12          Okay.

13  THE COURT:

14          It has nothing to do with any of this.

15  MR. MARTINICCHIO:

16          Okay.  So, Judge, we don't have any witnesses.

17  THE COURT:

18          Thank you.  You may step down, ma'am.

19  MS. GREEN:

20          That's the Commonwealth's case for purposes of

21          the preliminary hearing.

22  MR. MARTINICCHIO:

23          I mean, Judge, we have one Terroristic Threat

24          charge here.

25  THE COURT:

```
1                   That's fine.  No.  Terroristic Threat's not
2                   made out.  It's clear the case law says there
3                   was some spontaneous ticked off.  That's not
4                   Terroristic Threats.
5        MS. GREEN:
6                   Well, Your Honor, my argument with that is...
7        THE COURT:
8                   I made a decision.
9        MS. GREEN:
10                  ...it's not...
11       THE COURT:
12                  The decision's made.
13       MS. GREEN:
14                  Understood.
15       THE COURT:
16                  Terroristic Threats is gone.  So we have the
17                  other two charges.  I don't know how you guys
18                  live next door to each other.  I can't believe
19                  that you guys can live next door to each
20                  other, but -- and you haven't been able to try
21                  and work this out.  But that's...
22       MS. GREEN:
23                  Well, Your Honor, it's my understanding that
24                  she does not live there at this time.  The
25                  house has been condemned.
```

```
 1    THE COURT:
 2              All right.  Okay.  So Terroristic Threats is
 3              not made out.  Prima facie case made on the
 4              others.
 5    MR. MARTINICCHIO:
 6              I don't believe that she would have to have an
 7              arraignment, would she, if it's just the
 8              summaries that are being...
 9    THE COURT:
10              Let me see.
11    UNIDENTIFIED FEMALE SPEAKER:
12              It says M-3 and M-3.
13    THE COURT:
14              Yeah.  They're misdemeanors.
15    MS. GREEN:
16              Yes.  Correct.
17    THE COURT:
18              Yeah.  They're misdemeanors.  Yeah.
19
20    [End of Proceeding]
21
```

```
 1                   C E R T I F I C A T E
 2         I, Richard Coogan, hereby certify that the
 3    proceedings and evidence are contained fully and
 4    accurately on multitrack recording; that the recording
 5    was reduced to typewriting by my direction; and that
 6    this is a correct transcript of the same.
 7
 8                        _____
 9                        Richard Coogan, Administrator
10                        Court Reporters
11
12         YORK STENOGRAPHIC SERVICES, INC., hereby certifies
13    that the attached pages represent an accurate transcript
14    of the electronic sound recording of the proceedings in
15    the Court of Common Pleas of Delaware County,
16    Pennsylvania, in the matter of:
17
18               COMMONWEALTH OF PENNSYLVANIA
19
20                          vs.
21
22                    KARIMU HAMILTON
23
24                      CR-112-19
25
26               BY:
27
28
29               Donna M. Bupp
30               Transcriber for
31               York Stenographic Services, Inc.
32    DDB/CEG
```

York Stenographic Services, Inc.

34 North George St., York, PA 17401 - (717) 854-0077

```
 1            IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
 2                            PENNSYLVANIA
 3
 4                          CRIMINAL COURT
 5
 6      * * * * * * * * * * * * * * *      No. 5272-2019
 7                                    *
 8   COMMONWEALTH OF PENNSYLVANIA    *
 9                                    *
10          VS.                       *
11                                    *
12   KARIMU HAMILTON                  *
13                                    *
14      * * * * * * * * * * * * * * *
15
16
17
18                   Media, PA, October 4, 2021
19
20                            ***
21
22                     Courtroom Number 6
23                            ***
24                  TRANSCRIPT OF PROCEEDINGS
25
26   BEFORE:  THE HONORABLE JUDGE MARY ALICE BRENNAN
27
28            JERRY RASSIAS, ESQUIRE
29            For the Commonwealth
30
31            J. MICHAEL CONSIDINE, ESQUIRE
32            For the Defendant
33
```

Diaz Transcription Services

3601 Green Street, Harrisburg, PA  17110  (717) 233-6664

1                              <u>INDEX</u>

2

3                        DIRECT  CROSS  REDIRECT  RECROSS

4

5    <u>ON BEHALF OF THE COMMONWEALTH:</u>

6

7    [None]

8

9    <u>ON BEHALF OF THE DEFENDANT:</u>

10

11   [None]

12

13

14                            <u>EXHIBITS</u>

15

16                              MARKED     ADMITTED

17   <u>ON BEHALF OF THE COMMONWEALTH:</u>

18

19   [None]

20

21

22   <u>ON BEHALF OF THE DEFENDANT:</u>

23

24   [None]

25

26

27

```
 1                P R O C E E D I N G S
 2
 3              October 4, 2021 (10:01 a.m.)
 4          MR. RASSIAS:  Attorney Rassias from the
 5   Commonwealth.  When the Court's ready, can we
 6   address the matter for Karimu Hamilton?
 7              THE COURT:  Sure.
 8          MR. RASSIAS:  That's transcript 5272 of
 9   '19.
10              THE COURT:  All right.
11          MR. RASSIAS:  As I understand, this is a
12   Motion to Dismiss or Motion to Quash.  And just oral
13   argument before Your Honor.
14              THE COURT:  Okay.  Good morning.
15          MR. CONSIDINE:  Good morning.  My name is
16   J. Michael Considine, I represent Karimu Hamilton.
17   Good morning, Your Honor.  How are you?
18              THE COURT:  Good.  How are you?
19          MR. CONSIDINE:  I'm doing well.
20              THE COURT:  Good.  All right.  So you filed
21   a Motion to Quash, correct?
22          MR. CONSIDINE:  I filed a Motion to Dismiss
23   for Habeas Corpus.  And it's actually --
24              THE COURT:  Well, I think that acts as a
25   Motion to Quash.
```

1          MR. RASSIAS:  That's my understanding.

2          MR. CONSIDINE:  Essentially, yes.  Same

3     effect.

4          THE COURT:  Sure.  Okay.

5          MR. CONSIDINE:  Your Honor, let me just

6     give you the background of this case.  What happened

7     in this case is, there was a woman who had been

8     subject to a search where it was claimed that there

9     was cyanide gas in her house.  It ended up, they did

10    a search and there was no cyanide gas.  And a

11    Federal Judge found that the search was illegal, and

12    there's a claim pending on that.  The same day as

13    the search, my client was upset about what happened.

14    She was inside her house, she was angry.  She was

15    making statements, whatever, inside her house.

16    Okay?  And the video actually shows that it was

17    inside the house.  But this was not a situation

18    where it was unprovoked.  She was responding to a

19    very real violation of her rights because the police

20    they had.  So she was angry about it.  And she said

21    some offensive things, but the preliminary hearing,

22    they threw out terroristic threats, there was no

23    threats of physical injury to anyone.  There was not

24    -- and if you look at (a)(3), which is a harassment

25    statute, looking at that, first of all, there's no

1    evidence she struck, shoved --

2            THE COURT:  Well, tell me what's remaining.

3    You say terroristic threats was thrown out at the

4    preliminary hearing.  What is remaining?

5            MR. CONSIDINE:  What's remaining is

6    Harassment 2709(a)(3).  And (a)(3) is engaging in a

7    course of conduct, repeatedly committing acts

8    which --

9            THE COURT:  Is that an M3?

10           MR. CONSIDINE:  (a)(3).

11           THE COURT:  An M3?

12           MR. CONSIDINE:  Yes, it's an M3.  And then

13   also Disorderly Conduct.

14           THE COURT:  It is an M3, Mr. Rassias?

15           MR. RASSIAS:  Yes, Your Honor.

16           MR. CONSIDINE:  Those two.

17           THE COURT:  Okay.

18           MR. CONSIDINE:  Those two are --

19           THE COURT:  And Disorderly Conduct?

20           MR. CONSIDINE:  They're the only two

21   pending.

22           THE COURT:  As a misdemeanor or a summary?

23           MR. CONSIDINE:  They're both as

24   misdemeanors but I believe --

25           THE COURT:  Okay.

1          MR. CONSIDINE:  I'll get to the argument

2     about Disorderly Conduct, but I want to first start

3     with the -- with Harassment.  And the only --

4          THE COURT:  Well, you have to argue from

5     the record.

6          MR. CONSIDINE:  Right.  Argument from --

7          THE COURT:  Okay.  You're arguing from the

8     record.

9          MR. CONSIDINE:  Right.

10          THE COURT:  Okay.

11          MR. CONSIDINE:  I'm arguing from the

12     record.  And so she was inside her own house when

13     she did this.  Now, they live in a twin, so this

14     prosecuting person lived on the other side.  That

15     neighbor came, was outside the door and put a cell

16     phone up and started recording what she was saying

17     inside her house.  And if you remember we had the

18     Motion to Suppress on that.  And Your Honor saw the

19     video, if you remember, I know you have many cases,

20     but we were before Your Honor and we did opinion.

21     And that shows -- and this is on the record because

22     we already had a Motion to Dismiss, you already saw

23     the video.  And video shows --

24          THE COURT:  Is that same video that you

25     submitted that I saw that day?

1              MR. CONSIDINE:  Yes.

2              THE COURT:  Okay.  Go ahead.

3              MR. CONSIDINE:  If you remember that video,

4      Your Honor, what happened is you've got --

5              THE COURT:  Vaguely.

6              MR. CONSIDINE:  -- you've got kind of

7      little bit of light, like it's -- you can never see

8      Karimu Hamilton in the video.  Never can.  Instead

9      you hear her and it's obvious that someone is

10     outside the door with a cell phone up against the

11     door trying to record her.  And that's essentially

12     what happened.  And -- but under those

13     circumstances, you've got a privacy right of what

14     someone says in their own home.  It's very different

15     than something out in public or whatever.  So first

16     of all in my pre-trial statement in the Motion to

17     Dismiss I said requires repetition of the offensive

18     conduct.  This is a situation where she did say some

19     things, but it wasn't a series of many other

20     incidents, there was basically this one time.  And

21     she did not go to this prosecutor and witness over

22     her house and do it.  She didn't come to her face

23     and do it.  She's just expressing frustration that

24     she'd been subject to an illegal search and saying

25     some offensive things.  No doubt.  But, Your Honor,

1    the Supreme Court in the *Plummer versus City of*
2    *Columbus* case, from 1973, 414 US 2, says that a law
3    stating no person shall abuse another by using
4    menacing, insulting, slanderous or profane language
5    violates the First Amendment.  So there is a First
6    Amendment right to even use offensive language if
7    it's not further than what happened in this case.
8    And there isn't.  So just using insulting, menacing
9    or profane language is not enough to establish
10    harassment.  It's not.  That is protected speech
11    under the First Amendment.  And so here, also, if
12    you look at the definition under 2709, you have to
13    have a course of conduct or repeatedly committing
14    acts.  Now, acts or conduct is defined in 18 PACSA
15    Section 103.  This is in the Pennsylvania Code.  And
16    it says that an act is a bodily movement, whether
17    voluntary or involuntary.  We don't have any
18    evidence that there was any bodily movement here.
19    We just have speech.  Conduct is an action or
20    omission and its accompanying state of mind or a
21    series of acts and omissions.  So you have to prove
22    repeated bodily movements, or a series of omissions
23    and you cannot convict by oral communications in
24    one's own home, even if it's offensive, because of
25    our First Amendment.  Which says that this is

1    protected although it may even be offensive.  And so
2    here, all that they've shown, all that the record
3    has is somebody saying these statements after they
4    have been subject to an illegal search, saying
5    frustrating offensive things, but still that's
6    protected under the First Amendment.  If you look
7    though, under 5504, Harassment by Communication or
8    Address, that requires that it be repeated
9    communication anonymously, which is not here.  We
10   don't have someone calling someone on the phone and
11   making statements anonymously.  We have someone
12   privately expressing frustration.  For extremely
13   inconvenient hours or offensively course language,
14   we don't have that.  That's usually phone calls,
15   that kind of thing.  We don't even have any evidence
16   that this was something that was ever done in the
17   face of the "victim".  And there's actually a case,
18   this whole law, 2709, is based on the New York Penal
19   Law and there's a New York case that said that you
20   cannot convict based only on offensive language.
21   Especially if it's in someone's own personal home.
22   People have arguments with their spouses all the
23   time and they say whatever, that's not within the --
24   and the court in that case I cited in the brief
25   here, they said that that is not a course of conduct

1    within the meaning -- even if someone says offensive
2    words, it's not an act.  An act requires bodily
3    movement.  There's no evidence of any bodily
4    movement here.  There's no evidence of conduct or
5    act or omission.  So we also have to find that the
6    conduct was not legitimate and not constitutionally
7    protected.  And there is a constitutional protection
8    for even offensive language unless it goes within
9    the area of harassment.  Also, this is only a single
10   act.  Essentially, a single act, it wasn't like the
11   person, the next-door neighbor come over and said
12   would you quiet down.  Cut it out.  I don't want to
13   hear you.  That didn't happen.  Instead, she's just
14   recording her when she's having this private time of
15   saying things based on her frustration.  But also,
16   if you look at the *Commonwealth versus Battaglia*
17   case in the Pennsylvania Superior Court 1999, the
18   Court there said the Defendant was responding to bad
19   treatment by another, which she perceived to be
20   harassment, which is what happened here, and she
21   wasn't herself being provocative, even if she said
22   the word fucking sue, you can find that this is not
23   harassment, because you look at the overall
24   circumstances.  The circumstances are this woman was
25   the victim.  She was the one who had the illegal

1    search, and she was very frustrated and expressing

2    her frustration.  But also, here if you find under

3    5503 a misdemeanor of the third degree if the intent

4    of the actor is to cause substantial harm or serious

5    inconvenience or persist in disorderly conduct after

6    reasonable warning or request to desist.  Otherwise,

7    it's a summary offense.  We don't have any warnings.

8    The police didn't come and say listen, you better

9    cut this out.  She didn't say, listen, I don't want

10    you to hear this anymore.  Instead, she's secretly

11    taping her, secretly taping her and therefore at the

12    very worst, according to the Section B of 5503, this

13    is not a misdemeanor.  It's a summary at the very

14    worst.  But also, if you look at the second charge,

15    it's a Disorderly Conduct, under Section 5503, the

16    word public means affecting or likely to affect

17    persons in place to which the public or substantial

18    group has access, including highways, transport

19    facilities, schools, prisons, apartment houses,

20    place of business or amusement, any neighborhood, or

21    any premises which are open to the public.  This

22    definitely does not qualify.  This is within

23    someone's home.  And there's the highest amount of

24    First Amendment protection for discretion if it's

25    within someone's home.  And this is clearly, if you

1     saw the tape, it's within her home.  There's no
2     evidence on that tape that this was out on the
3     porch, this was in the other person's home, this was
4     outside.  It wasn't.  And there's no evidence that
5     this conduct was likely to affect persons in a
6     public place or cause risk of immediate breach of
7     the public peace.  And therefore, the record is
8     clear that this is not Disorderly Conduct, because
9     if you look at the case law, the Pennsylvania courts
10    have protected much speech that is offensive, such
11    as fuck you asshole, in *Pennsylvania versus Huck*
12    *[ph], Commonwealth versus Cody*, I cite the cases.
13    This is also not obscene speech.  Obscenities are
14    not protected under the First Amendment, but merely
15    saying offensive language is not obscenity.  And
16    there isn't any proof that there's any obscenity.
17    But here, the words weren't really directed to
18    anyone.  It wasn't like she came to the person's
19    face or something.  Why didn't the neighbor just
20    say, listen -- knock on the door and say listen, can
21    you cut that out.  It's bothering me.  I don't want
22    to hear it anymore.  She didn't do that.  She
23    secretly is taping her.  And I believe that that was
24    a violation of the wiretapping law, but the Court
25    found otherwise.  But here, she's just venting.

1    She's just venting.  She's very frustrated and there

2    was no intent to cause public inconvenience,

3    annoyance, or alarm.  There's not one person that

4    heard it other than this neighbor.  And this is not

5    the kind of conduct that is going to cause any kind

6    of public tumult.  It's not within a public setting.

7    No matter how distasteful or offensive to one's

8    sensibilities it may be, this can't be punished

9    merely because someone heard the words.  And so this

10   is similar to the conduct in the case of

11   *Commonwealth versus Bryder [ph]* which I state where

12   someone said go to hell, Betsy in public and that

13   was found that that was not obscene, didn't appeal

14   to peering interest, was not obscene and couldn't be

15   punished.  Here, there's no evidence that the

16   language was obscene.  And so we don't have any

17   member of the public who said we were disturbed.

18   This is in her own home.  And Your Honor, I think

19   this is a retaliatory prosecution because the

20   Federal Court found it in this case, there were two

21   illegal searches based on the lies of this person

22   who said there was cyanide gas.  There was no

23   finding of gas on the property.  The client was

24   taken out of her house at 6:30 in the morning by

25   police.  There's another violation for that because

1    it wasn't with due process.  This woman herself is

2    the victim.  And since she has -- we're not saying

3    that the conduct was not offensive, we're saying it

4    doesn't fall within the law.  Based on that tape

5    that you saw, there is a record here.  So the Court

6    has no real choice but to dismiss here because first

7    of all, they cannot make out Disorderly Conduct, but

8    even Harassment, there's no bodily movement.

9    There's no act here.  This is just pure speech in

10   someone's home.  And that's protected under the

11   First Amendment.

12          THE COURT:  All right.  Thank you very

13   much.  Mr. Rassias?

14          MR. RASSIAS:  The Defendant's Motion to

15   Quash should be dismissed for the following reasons.

16   First, in support of this oral argument, the

17   Commonwealth cites both the preliminary hearing

18   transcript as well as the Motion to Suppress

19   transcript.  What brings us here today is -- my

20   colleague on the Defense is correct, this is M3

21   Disorderly Conduct and M3 Harassment.  So in viewing

22   the evidence in the light most favorable to the

23   nonmoving party, that being the Commonwealth in this

24   case, the evidence in the record shows that the

25   Defendant in her own personal capacity, as

1    Your Honor knows, that is an admission under 803

2    Hearsay Law, automatically admissible.  So every

3    statement that she uttered in the course of that

4    four-hour time period that both the victim heard and

5    that the video memorializes are automatically

6    admissible.  She's using multiple -- I'm not going

7    to say all the words, but multiple obscenities, not

8    just traditional curse words, we'll put it that way.

9    All of these are intended right directly to the

10   victim.  As Your Honor knows, they share a duplex

11   together.  This is one shared porch, right next to

12   each other.  And these -- all these arguments about

13   whether or not there's a federal court case about a

14   search, none of that is relevant for today.  What

15   Your Honor has to decide is whether or not -- and

16   ultimately, what the Commonwealth would assert a

17   jury has to decide, is whether or not the words that

18   she uttered in her own personal capacity, again

19   automatically admissible, were threatening, were

20   disorderly and were harassing.  The Commonwealth

21   asserts they certainly were as the evidence shows

22   such.  For those reasons, this motion should be

23   denied, and you should schedule it for a jury trial

24   if Defense still seeks that.

25          THE COURT:  Okay.  Thank you.

1          MR. CONSIDINE:  Your Honor, we would ask

2   that you do an opinion in this case?

3          THE COURT:  Pardon me?

4          MR. CONSIDINE:  I had a similar case where

5   I represented a preacher who was arrested for

6   preaching and the judge threw out the case on Habeas

7   Corpus due to public opinion.  This is an important

8   issue of the First Amendment.

9          THE COURT:  Okay.

10         MR. CONSIDINE:  People have the right.

11         THE COURT:  I'm going to look at it.  I'm

12   going to let you know my --

13         MR. CONSIDINE:  Okay.  Thank you very much.

14         THE COURT:  -- answer.  Hold on.  Let me

15   give you a new date.

16         MR. CONSIDINE:  We would ask that you do an

17   opinion, Your Honor, because this is an important

18   issue --

19         THE COURT:  Do what?

20         MR. CONSIDINE:  We would ask that you do a

21   written opinion.  This is an important issue under

22   the First Amendment, Your Honor.  I believe there --

23         THE COURT:  All right.

24         MR. CONSIDINE:  -- is a First Amendment

25   right to even be angry and even curse.  In the cases

1    of the --

2              THE COURT:  December 6.  I'll give you my

3    decision by December 6th.

4              MR. CONSIDINE:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MR. RASSIAS:  Thank you.  Have a good day.

7              THE COURT:  The same to you.  Take care.

8                           ***

9         [End of proceeding, 10:17 a.m.]

10

<pre>
 1                    C E R T I F I C A T I O N
 2
 3       I, Richard Coogan, hereby certify that the
 4   proceedings and evidence are contained fully and
 5   accurately on multitrack recording; that the
 6   recording was reduced to typewriting by my
 7   direction; and that this is a correct transcript of
 8   the same.
 9
10                    _____
11                    Richard Coogan, Administrator
12                    Court Reporters
13
14       DIAZ TRANSCRIPTION SERVICES hereby certifies
15   that the attached pages represent an accurate
16   transcript of the electronic sound recording of the
17   proceedings in the Court of Common Pleas of Delaware
18   County, Pennsylvania, in the matter of:
19
20            COMMONWEALTH OF PENNSYLVANIA
21
22                         v.
23
24            KARIMU HAMILTON
25
26            #5272-2019
27
28            BY:
29
30
31            _____
32            Allison Babcock
33            Transcriber for
34            Diaz Transcription Services
35
36       The foregoing record of the proceedings upon the
37   hearing of the above cause is hereby approved and
38   directed to be filed.
39
40
41                    _____
42                                            Judge
</pre>

Diaz Transcription Services

3601 Green Street,  Harrisburg, PA 17110  (717) 233-6664

# J. MICHAEL CONSIDINE, JR., P.C.
### A Professional Corporation for the Practice of Law

J. Michael Considine, Jr. [1]                                          Esi Kovacs, LLM, Legal Intern[2]
1845 Walnut Street, Suite 1199                          17 Sunridge Court
Philadelphia, PA 19103                                   Durango, CO 81301
(215) 564-4000                                              (970) 385-0846
e-mail: adventure7@gmail.com              website: lawintegrity.com
                                                                      March 11, 2022

Karimu Hamilton

30 Garrett Drive

Rosemont, PA 19010


Re: Hamilton v. Flanagan, No. 19cv2588 (U.S.D.Ct., E.D.Pa.)

Dear Karimu

   The case against the Ridgeways is the weakest of all the claims. Your existing claim includes damages for the grapevine. They state in their interrogatory answers that no officer told them to do anything or to say there was dangerous or cyanide gas on the premises. Flanagan will not testify he told them to say that or to lie. There is a greater than 50% chance the case against them will be won by <u>them</u> on summary judgment. The issue is not whether they did bad things or lied, but for federal jurisdiction is whether they conspired with state actors. The claim for the false arrest based on their calls about a woman with a knife I think are the strongest. Collecting on a judgment vs. the Ridgeways is risky. Many times it such judgments are never paid.What assets do they have? There is a real risk you will get nothing from them. It makes sense to attempt a pre-summary judgment resolution. May I make a demand they  pay for the work on the pipe, move the fence and install a new grapevine plus pay some damages in exchange for your dropping the case and the criminal case be dropped. If you settle the case before the April 4 criminal trial you can possibly have Rachel's agreement not to testify in that trial part of a deal.
   In the criminal case, you have been offered a deal of a summary for harassment which is not a criminal record. You risk a misdemeanor conviction which is a criminal record. I need to put you on the stand, to calmly and professionally explain why you said what you did and mention the illegal searches and federal court opinion. The jury may be biased, may not like you or you may lose her temper. Read the cases in my motion to dismiss to understand the law.
   I recommend you give me authority to make an offer to settle against the Ridgeways as stated above. I stated this in my January 2022 letter to you to which you never responded.

   Sincerely,

---

[1]         Admitted in Pennsylvania and Colorado
[2]         Admitted in the Republic of Albania.

1

```
              IN THE COURT OF COMMON PLEAS
              DELAWARE COUNTY, PENNSYLVANIA
Commonwealth of Pennsylvania       :No. Cp 23-Cr-000
             v.                     5272-2019
Karimu Hamilton
```

Defendant's OMNIBUS PRETRIAL MOTION

1. Motion for Discovery

Defendant seeks to obtain discovery of all documents, videotapes, audiotapes, the entire investigation file, evidence that there was dangerous gas on the premises at 30-32 Garett, Bryn Mawr, PA in the period 2018-2020 and a list of the name and address of all witnesses who have knowledge of the matters regarding which Defendant has been charged with crimes in this matter.

2. Motion for Writ of Habeas Corpus

a. Facts. Defendant lives in a twin. On or about the same night the incidents giving rise to these charges occurred,it was alleged by her neighbor who lives in the other side of the twin that Plaintiff's residence contained dangerous cyanide gas so a warrant less search was done of Plaintiff's property. No such gas was found. PECO tested and no such gas was found. None was ever present. Two different warrantless searches occurred. In neither was any scientific evidence of cyanide or other gas found.

That same night, the neighbor, without the knowledge or consent of Defendant, used a cell phone or electronic recording device which she placed against the window or door of Defendant's residence to secretly record a private conversation or conversations Defendant had with a friend in which she expressed frustration that her home had been searched without a warrant based on false statements that there was dangerous gas.  What Defendant said, in the privacy of her home in a normal speaking voice with a good friend, and was a type of communication about which there is
a reasonable expectation of privacy. Nothing Defendant stated was to her neighbor in person. There were no threats of physical injury.

The Commonwealth seeks to use the audio and videotape of these intercepted conversations and/or the information obtained from them to prove harassment  under 18 Pa. C.S.A §2709(a)  and/or Disorderly Conduct under 18 Pa. C.S.A. §
b. Disorderly Conduct
**5503.  Disorderly conduct is defined:**

**(a)  Offense defined.--**A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1)  engages in fighting or threatening, or in violent or tumultuous behavior;

(2)  makes unreasonable noise;

(3)  uses obscene language, or makes an obscene gesture; or

(4)     creates a hazardous or physically offensive condition

(5)   An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a summary offense.id §(b).

**Definition.--**As used in this section the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public.

Saying "fuck you asshole" to a police officer is not a crime in Pennsylvania as to a police officer was also not considered fighting words because it is expected that officers are exposed to emotionally charged events on a daily basis. Pennsylvania v. Hock, 728 A.2d 943 (1999)In Commonwealth v. Kelly, 758 A.2d 1284 (Pa. Super. 2000)words and conduct used were disrespectful, insulting and offensive, but not obscene within the meaning of the statute) as defined by the United States Supreme Court in Miller v. California 413 U.S. 15, 24 (1973) so the court reversed convictions for disorderly conduct either because the offensive words used were not "obscene." In Commonwealth v. Weiss, 490 A.2d 853, 855 (Pa. Super. 1985)Weiss was charged and convicted of violating subsection (a)(3) of the statute for directing allegedly obscene words to a police officer after the officer entered her home to arrest her husband. Weiss argued that because the words she used were directed to the officer inside her home, the state failed to prove that her words were uttered with the intent to cause "public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ....In reversing her conviction on the grounds that the required intent under that statute was not established, the court distinguished Mastrangelo and Pringle as cases involving

speakers who made offensive statements in public
settings.The court further distinguished Mastrangelo as a
case brought under the "unreasonable noise" and not the
"obscene language" provision of the statute.Even though a
neighbor overheard the words Weiss used, the court held
that vulgar language, "however distasteful or offensive to
one's sensibilities" may not be punished merely because
people nearby hear the words. Finally, the Court rejected
an interpretation of the statute that would permit the
punishment of offensive speech directed to police officers
on grounds that such speech inflicts injury or causes
officers to react in a violent manner to the speaker.

In Commonwealth v. Bryner 652 A.2d 909 (Pa. Super. 1995)
Bryner was also convicted of using "obscene language" in
violation of subsection (a)(3) of the statute. However,
unlike the facts in Weiss, Bryner's language, "go to hell,
Betsy" was made in public in the presence of several
hundred people. On appeal, Bryner argued that his words
were neither obscene nor "fighting words. 'In reversing
Bryner's conviction, the court noted that the word
"obscene" had not been defined by the Superior Court in
Pringle. Adopting the United States Supreme Court's
definition of obscenity in Miller v. California, the court
held that because Bryner's words did not "appeal to
anyone's prurient interests," they were not obscene within
the meaning of subsection (a)(3) of the disorderly conduct
statute.The court concluded that it was not necessary to
consider whether Bryner's words constituted "fighting
words" because the issue involves a "separate and distinct
analysis" which it did not have to reach because
"subsection (a)(3) of the statute is narrowly drawn to
prohibit only obscene words or gestures.

.  In Oklahoma, a woman stating, "You're such an ass" and
"You mother f-ers, you can't-you're not brave enough to go
out and catch murders and robbers. You are a couple of
pussies" to two police officers did not involve fighting
words due to the increased restraint officers must use.
Harrington v. City of Tulsa, 763 P.2d 700 (Okla. Crim. App.
1988) In United States v. Poocha, 259 F.3d 1077, 1078
(2001) the 9th Circuit found saying "fuck you" to a park
ranger was not disorderly conduct as it was speech
protected under the First Amendment.Given all the
circumstances as a matter of law this was not harassment
and the charges must be dismissed.

There is no evidence the public ever heard or could hear
what was said in a private home in a private conversation.
There is no evidence Defendant ever was asked to desist,

refused to desist or that she intended to cause serious
harm or serious inconvenience. There is no evidence
Defendant did anything in public or that there was intent
to cause public inconvenience, annoyance or alarm, or that
anything she did caused these or reasonably could have done
so. The disorderly conduct charge must be dismissed because
without public inconvenience or alarm, there is no crime.
In the alternative, the charge must be reduced to a
summary.

c. <u>Harassment</u>

        Defendant is charged with harassment under Pa. C.S.A.
§2709(a). There is no allegation or evidence she struck,
shoved, kicked or subjected anyone to physical contact, or
threatened to do the same, followed anyone in a public
place, communicated repeatedly in an anonymous manner,
repeatedly at inconvenient hours or in an manner other than
specified in 18 Pa. C.S.A. §2709 (a) 4,5 or 6, so 18 Pa.
C.S.A. 2709(a) (1), (2), (5), (6) and (7) do not apply.

    Section (3) bans engaging in a course of conduct or
repeatedly committing acts which serve no legitimate
purpose. The tape shows Plaintiff was justifiably angry at
what her neighbor had done based with false allegations of
cyanide gas. Defendant was letting off steam. Her right not
to have her property searched without a warrant were twice
violated based on lies about there being dangerous gas on
the premises made by the same person illegally taping her
private conversations. It is name calling, done privately,
not to the neighbor's face, but in one's own home to a
third party, never repeated after the night this occurred.
It served a legitimate purpose as a protest to illegal
activity of bringing about two serahces based on
unsubstantiated lies. It was not even communicated to the
neighbor but to a friend, privately on the phone. This is
not harassment under section (3) because it had a
legitimate purpose of private protest of illegal action.

    Section (4) bans communicating to or about another
person any lewd, lascivious, threatening or obscene words,
language drawings or caricatures. No threats were made.
Nothing lewd or lascivious was stated. Just the word
"bitch," which while not polite, was stated. It is
constitutionally protected speech which could not give rise
to  the charge of disorderly conduct or harassment when
stated in public to a police officer. All these are
protected speech: Calling a police officer a "son of a
bitch" ([Johnson v. Campbell,](Johnson v. Campbell,)02-3580,USCA, 3rd Circuit June 05, 2003;

Yelling "fuck you all" to a police officer and security personnel at a nightclub (Cornelius v. Brubaker, Minnesota District Court, 2003); Telling a police officer: "I'm tired of this God damned police sticking their nose in shit that doesn't even involve them" (Brendle v. City of Houston, Court of Appeals of the State of Mississippi, 2000);Telling a security officer "This is bullshit" when rousted from a parking lot (U.S. v. McDermott, U.S.D.Ct., E.D.Pa.1997).

"Fuck the Draft," written on clothing is protected free speech. Cohen v. California 403 U.S. 15 (1971) . There is no harassment.

    If needed, Defendant requests a hearing on the Motion for Writ of Habeas Corpus.


    3. Motion to Suppress

  It is a crime in PA to intercept or record a telephone call or conversation unless all parties to the conversation consent. 18 Pa. C.S. A.§ 5703. Defendant did not consent. This was not in a public place but in one's home, a private conversation, so §5702 does not apply. The prosecution's only witness intentionally intercepted a wire, electronic or other communication of Defendant a felony of the third degree. 18 Pa. C.S.A. §5703. No court order was obtained to do so. The video and audio, and the contents of them were obtained in violation of Pa. Law. The legislature established a civil cause of action against the violator. 18 Pa. C.S.A. §5725(a). Even the commonwealth may be subject to civil liability; sovereign immunity is waived so its use by the prosecutor will subject it to civil liability. 18 Pa. C.S.A. §5725 (b). As the video and audio and their contents, and words and information gained from the illegal wiretapping, were obtained in violation of Pa law, that evidence must be suppressed  as obtained in violation of express Pa. Law.
    Law

## 1. §5703 Requires Exclusion of Evidence.

§5703 requires exclusion of evidence seized in the course of a wiretap: "Except as proof

in a suit or prosecution for a violation of this chapter, no evidence obtained as a result

of a violation of privacy or breach of privacy of messages shall be admissible as evidence

in any legal proceedings." As §5703 is not constitutionally mandated, it does not follow

that the sole legislative purpose of its "exclusionary" rule is the deterrence of police

conduct.

 2. <u>The purpose of the law is to protect privacy</u>. *Commonwealth v. Murray,* 423 Pa. 37, 52-53, 223 A.2d 102, 110 (1966) held:

"Were it not for the Act of 1957, irresponsible agencies could be emboldened to tap wires to obtain unauthorized information for the use of social scavengers, discredited business sharpers, and political buccaneers. They could pry into the most personal dealings and the most sacred relationships. . . . Without this guardian of our rights of privacy, every telephone user would have to conjure the possibility that the phantom hands of the electric eavesdropper could be clutching the very instrument into which he speaks. . . .Wire-tapping does not end with the mere listening operation. After the wire-leech has sucked in the blood of guarded secrets, he is then in a position to blackmail his unwary victim. He is in a position to traffic with corruption, threats and ill-gotten gains. That such a potential infamy could be tolerated in the name of the enforcement of the law would be the most extraordinary paradox in these paradoxical lines.

"The Pennsylvania Legislature has recognized all these perils and has legislated against them. It becomes the duty of the Courts to apply that legislation so that the Peeping Toms, the Paul Frys and the Meddlesome Charlies may not put to naught *the expressed will of the people in defending the dignity of man, the sanctity of family communication, and the liberty of its citizens*."

 C*ommonwealth v. Papszyci,* 442 Pa. 234, 236, 275 A.2d 28, 29 (1971) held:

a person other than a receiver can [not] testify as to the contents of a telephone conversation if he overheard the call by means of an amplification device without the consent of the caller." The Court noted that Pennsylvania's prohibition against the use of wiretap evidence is absolute. "[T]he Legislature has determined as a matter of state public policy that the right of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping or wiretapping. Such a determination, when within constitutional limits, is solely within the discretion of the Legislature."
442 Pa. at 239, 275 A.2d at 30.

 A review of the legislative history of the 1957 act, reenacted in Chapter 57 of the

Crimes Code, supra, reveals a similar uncompromising attitude towards the evidentiary

use of wiretap information. During the debate, Representative FINEMAN stated that ". .

. if the police can effectively undertake to do their work without the aid of wiretapping,

then we should not give them  such a right, when *giving them such a right means such*

*an insidious invasion of the rights which have been guaranteed to us,* the right to be

secure in our homes, in our personal thoughts and in our personal papers." Legislative

Journal, 1957, Vol. II, p. 1686. (Emphasis added). Other representatives expressed

concern that wiretapping was a substitute for good police work, and that such a practice

is contrary to our basic concept of freedom. The history indicates that the Legislature

did not seek primarily to deter the police, but rather intended to protect Pennsylvania

citizens' privacy from any electronic intrusion. While research has revealed no case

precisely on point, the California Supreme Court has recently resolved an analogous

problem. In *People v. Jones,* 30 Cal.App.2d 852, 106 Cal.Rptr. 749 (1973), the United

States Attorney received twenty tapes recorded pursuant to a wiretap authorized under

the Omnibus Crime Control Act, supra. The U.S. Attorney then gave the tapes to the San

Diego District Attorney who then presented them to a grand jury. The evidence was

suppressed and the Court in *Jones* upheld the suppression under the California Penal

Code, § 631, which is identical to § 5702 and 5703. After holding that the Omnibus

Crime Control Act does not pre-empt the field of legislation, the Court held that the

state's prohibition was absolute and despite the legality of the wiretap under federal

law, that legality  did not render the tapes admissible in state court. Accord, *United

States v. Turner,* 17 Crim.L.Rptr. 2449 (9th Cir. July 24, 1975).

   Section 5703 was not aimed solely at deterring Pennsylvania police practices; rather,

it expressed hostility to wiretap evidence.  A recording is not admissible [if] obtained in

violation of the Wiretap Act and that act makes no exceptions for admissibility of illegal

interceptions. *Commonwealth v. DeBlase,* 357 Pa.Super. 71, 515 A.2d 564 (1986). The

Supreme Court of Pennsylvania has addressed this issue in a similar circumstance. In *Commonwealth v. Brachbill,* 520 Pa. 533, 555 A.2d 82 (1989), the court addressed the admissibility of a police officer's testimony regarding a conversation he "intercepted" while listening on an extension. He had the permission of one party to do so. The court concluded that the contents of such an illegal interception in violation of the Wiretap Act should be suppressed. The court premised this conclusion on the legitimate expectation of privacy in our society. *Brachbill,* citing *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed. 2d 176 (1969); *Commonwealth v. Helms,* 234 Pa.Super. 537, 343 A.2d 362 (1975). The court found that even if one party may possibly have voluntarily participated in the interception, that alone cannot override a clear violation of the Wiretap Act. Therefore, if an interception by a police officer, which does have some indicia of reliability, must be suppressed, an interception in the sole control of a defendant cannot be deemed admissible. <u>Com v. Mathis</u>, 10 Pa. D. & C. 4th 1 (1991)

The act applies to oral communications and electronic and wire communications but not to public area video recording. <u>Pa. State Police v. Grove</u>, 199 A. 3rd 292 (2015).[1]

---

[1]     The Wiretap Act does not apply to oral communications where the speaker has notice of the recording. Grove, 119 A.3d at 1110, citing 18 Pa.C.S § 5702 (defining "[o]ral communication" as "[A]ny oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation"); Com. v. Henlen, 522 Pa. 514, 564 A.2d 905, 906–07 (1989); Gunderman v. UCBR, 95 Pa.Cmwlth. 479, 505 A.2d 1112, 1115 (1986). It held:

    Trooper Thomas's MVR included communications between the troopers themselves (who cannot possibly have had an expectation their conversations were not subject to interception), and between the troopers and the witnesses and drivers...these other speakers also could not have had a justifiable expectation their conversations would not be intercepted, and accordingly, the MVRs do not contain any "oral communications" protected under the Wiretap Act. The conversations occurred in broad daylight at the scene of an accident on a public roadway, to which state police officers responded. The conversations took place within earshot and easy view of bystanders or passersby. In fact, Grove's position statement

While telephone conversations used in the ordinary course of business are exempt, <u>Com. v. Spence</u>, 625 Pa. 84, 91 A. 3rd 44 (2014) the act applies to private phone conversations.

<u>Com. v. Deck</u>, 954 A. 2nd 603 (Pa. Super. 2008)where:

a minor...sought to prove Deck was having sexual relations with her...[she] telephoned Deck at his place of work. Deck was in his office with the door open when he took [her] call. At the start of the conversation [she] told Deck she had placed him on the speaker phone. Without Deck's knowledge or consent, [she] recorded the conversation on a cassette tape in an answering machine. ..[She gave the tape to police.]...the trial court's granted Deck's motion and suppressed the tape recording.The trial court determined that the telephone conversation was a wire communication under Section 5702 of the Wiretap Act, and that as such, was protected from interception under Section  5703...because the Act focuses on the protection of privacy, its provisions must be construed strictly. <u>Com. v. Spangler</u>, 570 Pa. 226, 809 A. 2nd 234, 237 (2002)...5702's definition of wire communication  does not include an expectation of privacy on the part of the speaker as does its definition of oral communication...we conclude that Section 5703 of the Wiretap Act prohibits the interception, disclosure or use of a telephone conversation as a wire communication under Section 5702, even if the telephone conversation is not an oral communication under Section 5702...5703 prohibited the interception, disclosure or use of the telephone conversation between C.P. And Deck...Deck's expectation of privacy is irrelevant...order affirmed.
Id, 605-610.

<u>Com. v. Diego</u>, 119 A. 3rd 370 (Pa. Super 2015) held:

an iPad is an electrical, mechanical or other device that does not fall within the telephone exception under the Wiretap Act...when engaging in a conversation over the telephone, a party would have no reason to believe that the other party was taping the conversation. <u>Con. v. Proelto</u>, 771 A. 2nd 823, 829 (Pa. Super. 2001)...police did not obtain a recording of that conversation from Appellee at all. Thus the heightened expectation of privacy  recognized in <u>Riley v. California</u>, 134 S. Ct. 2473 (2014) is not applicable. Telephone conversations are wire communications which unlike oral communications are protected against interception without regard to the speaker's expectation of privacy. <u>Briggs v. American Air Filter Co.,Inc.</u>, 630 F. 3rd, 417 n. 4 (5th Cir. 1980)...if an intercept did not occur during the transmission of the message, or at least simultaneous to the receipt of the message, then we must conclude that no intercept occurred at all.
Id at 375-376, 379, 381.

<u>*Com.v. Brion*</u>, 539 Pa. 256, 261, 652 A.2d 287, 289 (1994) held:

an individual can reasonably expect that his right to privacy will not be violated in his home through the use of any electronic surveillance ... With respect to oral communications occurring within one's home, interception [when one party has consented] can only be deemed constitutional under [the Pennsylvania Constitution] if there has been a prior determination of probable cause by a neutral, judicial authority."
*Brion, supra,* at 261, 652 A.2d at 289 (1994)

Oral conversations have a reasonable expectation of privacy. <u>Com. v. Crittenden</u>, 976 A. 2nd 1176 (Pa. Super 2009)

---

submitted to the OOR includes her own observations and even her paraphrasing of the conversations between the drivers and the troopers...It is clear the individuals at the scene could have had no reasonable expectation of privacy, or any justifiable expectation that their statements and images were not being

Recording a private conversation at a person's home violates §5703, <u>Com. v. Kuder</u>, 62 A. 3rd 1038, 1046 (Pa. Super. 2013), especially if it is done to record a person's private statements and that person was unaware of the recording, <u>Matenkowski v. Green</u>, 213 A. 3rd 1018, 1030 (Pa. Super. 2019), or if is done on the porch of someone's home in a rural area.<u>Com. v. Myers</u>, 450 Pa. Super. 482, 676 A. 2nd 662, 665 (1996).

Recording with a cell phone violates §5703, <u>Com. v. Kline</u>, 177 A. 3rd 922 (Pa. Super. 2017), including the use of a smart phone to record surreptitiously (as the smart phone is not then being used as a telephone but as a tape recorder, for it is the recording that is banned), <u>Com. v. Smith</u>, 136 A. 3rd 170, 174, 176, 178 (Pa. Super. 2018), and use of an electronic baby monitor and receiver in conjunction with a tape recorder of other private parties in an apartment, <u>Com. v. Parrella</u>, 416 Pa. Super. 131, 610 A. 2nd 1006, 1007 (1997).  Where recording is with a cell phone, there need not be proof of a reasonable expectation of privacy. <u>Com. v. Rosa</u>, 21 A. 3rd 1264, 1269 (Pa. Super. 2011)

<u>Com. v. Parrella</u>, supra, held:
 Appellee and decedent only lost their reasonable expectation or privacy as to the limited portions of her conversation  which were overheard outside the apartment without the aid of an improvised interception system. The appellent and decedent did not lose their reasonable expectation of privacy  to all of their conversation  that occurred in their apartment on the January 19-20, 1990 night merely because some portions of their conversation were able to be heard outside the apartment. If we were to adopt the Commonwealth's argument, we would be enabling any eavesdropper to immediately begin the unconsented mechanical or electronic amplification and interception of that conversation of anyone in the home once a portion of their conversation was able to be overheard outside the home with the naked ear. Clearly, this was not the result intended by the legislature when they adopted the act, whose primary focus and purpose was the protection of privacy. Thus, we find no merit in the Commonwealth's assertion that Ms. Horner and Ms. Feldbauer were entitled to surreptitiously record  all of the conversation between Appellee and decedent which occurred inside the apartment  January 19-20,

captured on MVRs, or by any number of cellphones for that matter. Under the circumstances, we conclude disclosure of the MVRs pursuant to the RTKL does not violate the Wiretap Act.

1990 because limited portions of the conversation inside the apartment were overheard by persons outside the apartment...the conduct of Horner and Feldbauer clearly violated the act.

supra, 610 A. 2nd at 1010-1011.This means Ridgeway and her husband may testify as to

what they heard with the naked ear even if the recording is suppressed.

3. The Independent Source Doctrine Does Not Apply
   Under 18 Pa. C.S.A. 5721.1(c)(6) Evidence shall not be deemed to have

been derived from communications excludable under subsection (b) if the respondent can

demonstrate by a preponderance of the evidence that the Commonwealth or the

respondent had a basis independent of the excluded communication for discovering such

evidence or that such evidence would have been inevitably discovered by the

Commonwealth or the respondent absent the excluded communication. Com. v.

Melendez, 676 A.2d 226 (Pa. 1996) held:

application of the 'independent source doctrine' is proper only in the very limited circumstances where the `independent source' is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered."

Id. at 231. The interceptor and hearer of the evidence was the same person. She was

spying on Defendant and got this evidence. There is no evidence she asked Plaintiff to

stop or told her about this secret interception. The video and audio must be suppressed

and the interceptor must not be permitted to testify as to what she heard and what she

recorded.

4. Continuance
   Defendant very recently retained her counsel. She seeks a continuance so discovery may be obtained and the court may consider the matters in the Omnibus Pretrial Motion and a pretrial conference as per Rule 578, Pa. R.Cr. Procedure.

Date: August 28, 2020                    _____
                                          J. Michael Considine, Jr.
                                          Pa. Attorney I.D. #37294

11

J. Michael Considine, Jr., P.C.
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
(215)564-4000
Counsel for Defendant Karimu Hamilton

CERTIFICATE OF SERVICE

I, J. Michael Considine, Jr., hereby certify that I sent a true and correct copy of the Omnibus Pretrial Motion to the Office of the District Attorney,  201 W Front St, Media, PA 19063 by first class mail.

Date: August 28, 2020                    _____

                                     J. Michael Considine, Jr.

```
              IN THE COURT OF COMMON PLEAS
              DELAWARE COUNTY, PENNSYLVANIA
Commonwealth of Pennsylvania        :No. Cp 23-Cr-000
              v.                      5272-2019
Karimu Hamilton
```

<u>Defendant's Motion for Habeas Corpus and to Dismiss</u>

A. <u>Facts</u>. Defendant lives in a twin. On the same night or night before the incident giving rise to these charges occurred,it was alleged by her neighbor who lives in the other side of the twin that Defendant's residence contained dangerous cyanide gas. A warrant-less search was done of her premises. PECO tested and no such gas was found. None was ever present. Two different warrantless searches occurred. In neither was any scientific evidence of cyanide or other gas found. Claims for illegal searches were established. <u>Hamilton v. Radnor Township</u>,502 F. Supp. 3Rd 978(E.D.Pa. 2020). The neighbor, without the knowledge or consent of Defendant, used an electronic recording device which she placed against the window or door of Defendant's residence to secretly record a private conversation Defendant had or words she said herself  in which she cursed and expressed frustration that her home had been searched without a warrant based on false statements that there was dangerous gas. See attached video. It was not said to the neighbor's face or with knowledge the neighbor was taping and nowhere made threats of injury, just expressions of frustration. What she said, in her own home in a normal speaking voice and to herself, and was a type of communication about which there is a reasonable expectation of privacy. The neighbor never asked her to stop nor did Defendant refuse any request of the neighbor. Nothing Defendant stated was to her neighbor in person. This is pure speech, without any accompanying acts, protected under the First Amendment.

B. <u>Law and Argument</u>
    1.    Defendant is charged with harassment under Pa. C.S.A. §2709(a). There is no evidence she struck, shoved, kicked or subjected anyone to physical contact, or threatened to do the same, followed anyone in a public place, communicated repeatedly in an anonymous manner, repeatedly at inconvenient hours or in an manner other than specified in 18 Pa. C.S.A. §2709 (a) 4,5 or 6, so 18 Pa. C.S.A. 2709(a) (1), (2), (5), (6) and (7) do not apply.
    2.     Section (3) bans engaging in a course of conduct or repeatedly committing acts which serve no

1

legitimate purpose. It requires repetition of the offensive conduct. <u>Com. v. Duncan</u>, 239 Pa. Super. 539, 363 A. 2nd 803 (1976) Repeated requests to cease and refusals to do so show intent to harass. There were no such requests. §2709 was enacted to prohibit conduct not constitutionally protected which is intended to alarm or seriously annoy another person. Id, 545-547. The legislature sought to prevent not the initial impact of unwelcome intrusions upon privacy,  but rather repeated assaults on individual privacy interests. In <u>Duncan</u>,Defendant invited the prosecutrix to her face to engage in oral sex repeatedly, lewd and illegal activity, not expressing social or political beliefs or engaging in any legitimate conduct. The court found he was going beyond communication to invade a substantial privacy interest in an intolerable manner. Here, there was no face-to-face communication. Instead there were expressions of frustration based on the neighbor's calling police for an illegal search based on lies, which is legitimate conduct even if distasteful.

    3.   A law  stating "no person shall abuse another by using menacing, insulting, slanderous or profane language" violates the First Amendment, <u>Plummer v. City of Columbus, Ohio</u>, 414 U.S. 2, 3 (1973) and the court will not give it a narrowed construction.The court must read §2709 so it does not prohibit protected expression. The language here is protected because it is in her home, in reasonable response to a very real invasion of her home.

    4.   The behaviour banned by §2709 is course of conduct or repeatedly committed acts. The term "act" and "conduct" are specifically defined in the Preliminary Provisions of the Crimes Code, 18 Pa. C.S.A. §103, as follows: Act or action: A bodily movement whether voluntary or involuntary. "Conduct": am action or omission and its accompanying state of mind, or, where relevant, a series of acts of omissions." A conviction under subsection 3 requires a showing or repeated bodily movements or a series of omissions;oral communications alone are by definition insufficient. §5504, Harassment by Communication or Address, provides "A person commits a misdemeanor of the third degree if with intent to harass another, he (2) makes repeated communications anonymously or at extremely inconvenient hours or in offensively coarse language." §2709 was adopted verbatim from §240.25 of the New York Penal law, L 1965, c. 1030; amended 1967, c. 791, §41. eff. Sept. 1, 1967. The New York courts have interpreted their counterpart of section 3 to exclude situations of offensive language only. In <u>People v. Paradisio</u>, 58 Misc. 2nd 370, 295

2

N.Y.S. 2Nd 561 (1968), Defendant allegedly used abusive and offensive language at the home of complainant. The court held that such behaviour does not fall within the counterpart of subsection 3  since the definitional section "of the penal law defines 'act' as a bodily movement and "conduct" as an act or omission  and its accompanying mental state.It appears therefore that the use of abusive and obscene language is not an act within the meaning of the Penal law or a course of conduct within the meaning of the same. It is therefore no prosecutable except where expressly provided under the penal law." 58 Misc. 2nd at 374, 295 N.Y.S at 564-565. Com. v. Duncan,supra,(Spaeth, dissenting). Here there were no acts only speech.

   5.    Conduct must be nonlegitimate and not constitutionally protected. Com. v. Miller, 455 Pa. Super. 534, 689 A. 2nd 238 (1997). Complaining about an illegal search is legitimate speech even if it involves name-calling.

   6.    A single act is not enough to be considered a course of conduct. Com. v. Zullinger, 450 Pa. Super. 533, 676 A. 2nd 682 (1996); Com. v. Lutes, 793 A. 2nd 949 )Pa. Super. 2002); Com. v. Battalgia, 725 A, 2nd 192 (Pa. Super. 1999); Com. v. Sewell, 702 A. 2nd 570 (Pa. Super 1997). This is a single act of complaining.

   7.    Where Defendant was responding to bad treatment by another which she perceived as harassment, not provocative, even saying he would "fucking sue," this is not harassment. Com. v. Battalgia, 725 A, 2nd 192 (Pa. Super. 1999). Here Defendant was responding to the bad treatment by her neighbor.

**8. 5503.  Disorderly conduct:**
   **(a)  Offense defined.--**A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
                         (1)  engages in fighting or threatening, or in violent or tumultuous behavior;
                    (2)  makes unreasonable noise;
   (3)  uses obscene language, or makes an obscene gesture; or
      (4)     creates a hazardous or physically offensive condition
   **(5)**  An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or

request to desist. Otherwise disorderly conduct is a
summary offense.id §(b).

   **Definition.--**As used in this section the word "public"
means affecting or likely to affect persons in a place to
which the public or a substantial group has access; among
   the places included are highways, transport facilities,
schools, prisons, apartment houses, places of business or
amusement, any neighborhood, or any premises which are open
                        to the public.
There is no evidence of public inconvenience or that anyone
   outside could hear this. Speech inside one's house not
disrupting the public in reaction to an illegal search of
her premises is not disorderly conduct. In Com. v. Gillis,
61 Pa. D & C 4th 42 (2002), the court granted a similar
   motion as a campus preacher who used name calling in a
debate with a person heckling his message had protected
   speech. The court granted the habeas corpus petition.


   WHEREFORE, Defendant requests that all charges be
dismissed because the speech without any "acts" here was
protected under the First Amendment. In the alternative,
Defendant requests that the Disorderly Conduct charges be
dismissed because there is no evidence or public
inconvenience or tumult.

Date:  September 8, 2021
_____
J. Michael Considine, Jr.
J. Michael Considine, Jr., P.C.
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
(215)564-4000
Counsel for Defendant Karimu Hamilton


                    CERTIFICATE OF SERVICE
I, J. Michael Considine, Jr., hereby certify that I sent a
true and correct copy of the Motion for Habeas Corpus and to
Dismiss to Jerry Rassias, Assistant District Attorney,
Office of the District Attorney,  201 W Front St, Media, PA
19063 by first class mail.

Date: September 9, 2021
                        _____


                               4

# Fwd: CP-23-CR-5272-2019/12/05/19 Public Defender Files Motion for a Private attorney due to " conflict of interest" Inbox ×

**karimu abena** <kabenakito@gmail.com>
to Diana, bcc: kearney6031, bcc: hakimsims5, bcc: Lawrence

Thu, Dec 5, 2019, 11:19 AM

---------- Forwarded message ----------
From: Davalos, Vincent <DavalosV@co.delaware.pa.us>
Date: Thu, Dec 5, 2019, 11:18 AM
Subject: CP-23-CR-5272-2019
To: <kabenakito@gmail.com> <kabenakito@gmail.com>

Dear Ms. Hamilton:

I am writing to you on a few issues. Chief among them is the decision to file a conflict petition with the Court of Common Pleas to have a private attorney assigned to you at no extra cost. Concerning your conversation that you communicated to me on November 25, 2019 about Mr. Zarrilli, I believe you are hesitant to provide information to this office. What you communicated did give me much consternation and after careful consideration I feel you will be more comfortable with private counsel that has been assigned to you.

Considering we have not received the evidence that you stated you would provide to us, I would ask you to hold it until we receive word on the motion to appoint counsel is finalized. If I can be of any further assistance in the meantime, please do not hesitate to contact me on my cell phone or through e-mail.

Thank you,
Vincent J. Davalos, Esq.

**kea...6031@aol.com**
Karimu, Deliia...an answer to...

Thu, Dec 5, 2019, 3:28 PM

**karimu abena**
I agre...

Fri, Dec 6, 2019, 8:43 AM

**karimu abena** <kabenakito@gmail.com>
to Diana
Last ema...Vinc...

Wed, Dec 18, 2019, 1:27 PM

[Reply]  [Forward]

(no subject)   Inbox ×

Michael Considine
to me

June 11, 2022 4:08 p.m.

Dear Karimu

If you follow my directions and testify as I request you to do, you have a greater chance of winning the trial on June 13, 2022 if you testify than if you fail to take the stand.

J. Michael Considine, Jr.

**June 12, 2022**

**Notice of Removal**

**Commonwealth vs. Hamilton**

**No. 5272_2019**

**Submitted by Karimu Hamilton –on her own behalf – pro-se**

**Supportive Documents**

**1.Screenshot 311-314 Criminal Procedural Documents**

**2.Transcript 1 –Preliminary Hearing**

**3. Transcript2- Defense Motion to Dismiss PDF-A17208**

**4. Hamilton 03/11/2022-letter from attorney stating summary offense is not a criminal record**

**5.Omnibus pre-trial motion to dismiss**

**6. 2nd Motion to Dismiss**

**7. Informa Pauperis application**

**8. Public Defender conflict of interest letter**

**9. Letter from Considine on 6/11/2022 destructive defense plan**

## CASE BACKGROUND

On June 12TH Rachel Ridgeway came to the Radnor Township Police Department regarding an alleged incident which occurred on June 8th 2019 somewhere between 1700 hours to 2130 Ridgeway states that Hamilton was in front of her door yelling obscenities. At the preliminary hearing stage of this proceeding on cross examination Ridgeway insists that she was afraid, had no reason to leave her home. She remained in her home as defendant stood in front of her door and yelled obscenities.  At the Omnibus –pretrial and Motion to dismiss hearing Defendant submitted a motion to suppress evidence. Defendant advised to the court that the evidence submitted was an illegal wiretapping. The evidence submitted shows the opposite of her testimony. It shows the Plaintiff, walking outside of her home over to the Defendants porch door to record an audio/video with her phone. A second Motion to dismiss submitted because none of the

Criminal Charges are in concert with what actually happened. Both Motions to Dismiss were denied by Judge Brennan.

## GOOD CAUSE FOR UNTIMELY REMOVAL & GROUNDS

**Covid –19** pandemic the Commonwealth was scheduling updates every 6 months and Defense was coerced into waiving rights to speedy trial.

**Malpractice. Misrepresentation and Neglect on behalf of Attorney's.**

**Lawyers-** Defendant has had three attorneys a **Public Defender** Vince Stavalos and Daniel Pallen. Public Defender Staff member Virilli at the time explained to me that there that their loyalty was not to the Constitution but to the Courts. The Delaware County Public Defender's Office recommended a Private State Attorney.

**Daniel Pallen** Though the evidence, recording was obtained illegally via, trespassing and an illegal wiretapping, Pallen refused to acknowledge the "condition" of the evidence.

Daniel Pallen still recommended that I take a plea deal versus arguing on behalf of the side of the law.

**Michael Considine** also engaged in mal- practice and has been a barrier to justice. He misleads the defendant to believe that "removal" to Federal court was not an option. He put the defendant on the stand to testify against her will and the Commonwealth of Pennsylvania via the district attorney's office considers this to be an admittance under the 803-hearsay law. (doc2) and want to now remove the evidence and base the case on the testimony of the Defendant. Considine has stated that he will not cross examine Rachel Ridgeway on the facts of the case. He will refuse to communicate to or demonstrate the pattern of lies that Rachel Ridgeway has displayed. In both the preliminary hearing transcript and the Omnibus pretrial hearing Ridgeway states she was inside of her home and was afraid to come outside. The evidence submitted shows her outside of defendant's front door with an audio video recording device. Though he has submitted motions on behalf of defendant. He still recommends that Defendant accept a "deal". She trespassed onto Defendants property (which she has a history of doing Hamilton vs. Radnor) He has pivoted and recommended that the defendant accept a "deal". He also lied and attempted to mislead the Defendant that the offer would not cause harm, injury in the form of a Criminal record. If a lawyer misleads a client about the nature of criminal charges, he cannot be trusted. He is working in concert with the prosecution and not in concert with the constitution. Though

Ridgeway is the apparent criminal in this matter Considine still recommends Defendant for charges within his defense.

## Judges.

Presiding Judge Brenan is a Senior Judge and well respected among her peers within the Delaware County State Court System. She is pro police and is a Prosecutorial Judge. She denied two motions to dismiss without providing grounds for her dismissal. In the first motion to the dismiss the Defense pleaded with the state courts that disorderly conduct requires Defendant to be outside. (doc5) However Judge refuses to rule on the side of the law. Judge Brenan has a bias against the defense not based on the law but on a personal beliefs and ideals. Judge Brenan coerced defense into waiving her right to speedy trial. stating that it was the "law". She is guiding the next generation of legal professionals on how to deny defendant equal protection of the law within the court system.

## Delaware County District Attorney's Office

Brttany Green- ADA- Katayoun Copeland District Attorney

Heather Hayes ADA- Jack Stollsteimer

Jerry Rassias ADA- Jack Stollsteimer

The listed ADAs argue that despite the fact that their witness Ridgeway has lied about the circumstances and conditions of the evidence. They are still vigilant about commencing a proceeding for Disorderly Conduct and Harassment and

believe that it is legal to provide to the state courts an illegal wiretapping as evidence & to charge defendant with a crime that does not coincide with what actually tool place. This is because of their leadership; they are being taught how to violate the legal rights of the Defendant.

**Legal Grounds**§ 1443. Civil rights cases

Any of the following civil actions or criminal prosecutions, commenced in a state court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

**(1)** Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

**(2)** For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law